

**Atlantic Psychiatric Services**

500 VIKING DRIVE, SUITE 200 • VIRGINIA BEACH, VA 23452
Phone: (757) 468-0550 • Fax: (757) 468-9992

Rebecca E. Barchas, M.D., L.F.A.P.A.

Rajinder S. Dhillon, M.D.

Leonard M. Dileo, M.D., F.A.P.A

Katharine Heatwole, M.D.

John F. Riedler, M.D.

Mark T. Schreiber, M.D., D.L.F.A.P.A., F.A.S.A.M.

Thomas K. Tsao, M.D., D.L.F.A.P.A.

William A. Yetter, M.D., F.A.P.A.

Jessica Adams, A.P.R.N., B.C.

Tamara L. Atkinson, L.P.C.

Jennifer Baker, M.S.N., N.P.-C.,

Kerry Boone-Savinsky, L.C.S.W.

Melissa S. Clas, L.P.C., N.C.C.

Jennifer Cooke, P.A.

Jessica R. Dexter, N.P.R.N., B.C.

Karen S. Johnson, L.P.C., L.M.F.T.

Joy P. Kannarkat, Ph. D.

Laurel N. Llobell, L.P.C.

Cheryl Lumbard, F.N.P – C.

Susan E. Masterson, L.C.S.W.

Susan P. Menter, L.C.S.W., B.C.D.

Courtney E. Michels, L.P.C., C.S.A.C.

David M. Savinsky, L.P.C., L.M.F.T., C.S.A.C.

Phyllis Saunders, L.C.S.W.

Thomas A. Sugden, Psy.D.

Joyce H. Tsao, L.C.S.W.

Steven F. Waranch, Psy.D. C.S.A.C.

Ken L. Wells, L.P.C.

Diane M. Carrone, M.B.A., C.B.M.
Practice Administrator

July 24, 2012

To: Mr. Robert J. Haddad
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
Southport Centre
4525 South Boulevard
Virginia Beach, Virginia 23452-1137

Re: Ms. Kelli Grese

Dear Mr. Haddad:

You have asked that I prepare a report in regards to the medical issues in this case. Specifically, I was asked to address the standard of care of the medical treatment given by physicians at the Veterans Administration, whether or not the care Ms. Grese received at the Veterans Administration played any role in her committing suicide and whether or not Ms. Grese suffered from a psychological/psychiatric condition at the time she committed suicide such that she would not have been able to discern right from wrong. To do so, I have reviewed the records of the treatment for Ms. Grese from the Veterans Affairs Medical Centers in Hampton and Salem at various times from June 2, 1998 through Ms. Grese's death. I've also reviewed records of her treatment at Virginia Beach Psychiatric Center from September 1, 2001 through her death. I've also reviewed the report of her autopsy, a copy of the diary that Ms. Grese kept during January 2010, an email sent by Ms. Grese to her mother in November 2010, the Initial Disclosures of the Defendant, United States of America, discovery responses and documents provided by the Defendant, United States of America, and the depositions of Dr. McDaniel and Mr. Mui. I have formed the following opinions, which I will state to a reasonable degree of medical certainty. I will expound upon the opinions below, but in summary, I find that:

The United States, through the Veterans Administration, and specifically through Dr. William McDaniel, breached the applicable standard of care as it relates to the care and treatment given to Ms. Grese during the time that she was a patient under their care; as a direct result of the breach of the applicable standard of care, Ms. Grese committed suicide; at the time Ms. Grese committed suicide, she was suffering from paranoid psychosis and depression with a specific suicide plan, as well as paranoid delusions and command hallucinations which made it impossible for her to understand the right or wrongfulness of her actions, nor was she able to understand the consequences of her actions which were driven by an unrelenting command hallucination.

In order to fully explain my opinions, I have to digress through Ms. Grese's treatment. The records document that Ms. Grese's formal psychiatric treatment at the Hampton VA started in 10/07/1999 under the direct care of Walter Mostek, M.D. Dr. Mostek worked with Ms. Grese for over seven years until 10/30/2006. He saw her for 25 individual therapy sessions at the rate of about one session every 3.5 months. This low frequency of sessions and intensity of treatment clearly indicates that Dr. Mostek did not see Ms. Grese as experiencing acute psychological distress. His notes document the signs and symptoms of PTSD and substance abuse. He never noted or diagnosed any evidence of psychosis or suicide potential, except referring to her hospitalization and partial hospitalization at the Virginia Beach Psychiatric Center.

During Dr. Mostek's treatment of Ms. Grese, she had two acute care psychiatric hospitalizations and one PHP experience at the Virginia Beach Psychiatric Center. The first was on 09/01/2001 when she was admitted under the care of Mark T. Schreiber, M.D. She was diagnosed as having a "Major Depression, first episode, with suicidal features." He also, and significantly, documented, "No hallucinations, delusions, ideas of reference or control." So at this point in time Ms. Grese is depressed with "suicide features" but is, by legal test, of sound mind. What's interesting about this acute care hospitalization is that it represents the first indication that there was no coordination of care in Ms. Grese's case, almost as if Dr. Mostek and Dr. Schreiber were operating in a vacuum, being unaware of each other's existence or what treatment each was providing to her. Certainly there is no evidence of any communication, verbal or otherwise, between the two psychiatrists. More importantly, the seed of Ms. Grese's eventual psychosis, increasing suicidality and ultimate suicide is planted in Dr. Mostek's note of 05/16/05 when he quotes Ms. Grese as saying, "Dr. Schreiber dx her as 'bipolar and ADD.' She reports having hx of having poor concentration, and was on Adderall at one time." He further documents, "r/o ADD," but in fact never rules ADD in or out, does not personally evaluate her for the condition, does not order psychological testing, makes no documented attempt to obtain pervious records related to said diagnosis; and, despite all this failure to act prescribes her amphetamine medication, which prescription is carried forward by Ms. Grese's VA psychiatrists that follow.

This lack of coordination of care was further magnified when Ms. Grese is admitted for a second time to VBPC, this time under the care of John F. Riedler, M.D. (02/22/2005). Dr. Riedler's primary diagnosis is that of "Major Depression" now being "Recurrent." Ms. Grese is now clearly depressed, enough to be hospitalized, but Dr. Riedler notes, "No evidence of a formal thought disorder." Therefore, Ms. Grese is still legally sane at this point in time. However, Dr. Mostek, based on the records, seems to have been still operating in a vacuum in his ongoing work with Ms. Grese, there being no documented evidence of communication or any such effort to coordinate care.

Ms. Grese then has a partial hospitalization program (PHP) at VBPC this time again under the care of Dr. Schreiber (05/02/2005). Once again, she demonstrates no evidence of psychosis or thought disorder, while Dr. Mostek, Ms. Grese's primary VA psychiatrist at the time, according to the VA records, still seemed to be oblivious to her civilian interventions.

Ms. Grese's psychiatric care at the VA is taken over on 08/21/2007 by Christian DeFilipo, M.D., and he works with Ms. Grese until 06/06/2008. He sees Ms. Grese for 8 individual sessions, and basically continues Dr. Mostek's treatment plan and diagnoses. He does document the existence of a non-VA therapist, Claudia Brown, but other than the notation there is no documentation of any effort to communicate with Ms. Brown nor evidence of any effort to coordinate care. It is also during Dr. DeFilipo's care that Ms. Grese is started on Seroquel, a medication that will be continuously prescribed and taken until her death by overdose of Seroquel on 11/10/2010.

Steven Cunningham, M.D. picks up Ms. Grese's VA care on 07/07/2008, and documents that Ms. Grese had two more psychiatric hospitalizations on his watch. One was in Pittsburgh, Pa., following 'threats of suicide," and another admission to VBPC, which it turns out will be a major milestone in Ms. Grese's history. Once again, and a recurrent omission, there is no documented evidence that there was any effort made to obtain medical records from either facility or any effort to coordinate care. In fact, there is some indication in Dr. Cunningham's notes that points to the lack of such effort when he notes the wrong date for the VBPC admission, indication that the only information gotten was from Ms. Grese herself.

Significantly, on Dr. Cunningham's watch, there is an important and critical change in emphasis in Ms. Grese's diagnose and treatment plan. Once again, Ms. Grese's VA psychiatrist Dr. Cunningham mentions ADD where he notes, "Diagnosed with ADD years ago." However, he takes a more aggressive treatment course than previously done. The VA

medical record shows that Dr. Cunningham started conservatively with Welbutrin, but eventually goes on to prescribe Ritalin and finally Adderall, at times prescribing both simultaneously for Ms. Grese. It should be noted here that until the start of the prescription of stimulants for Ms. Grese, all her treating therapists and psychiatrists, both civilian and VA, agreed that she suffered with PTSD, depression and substance abuse issues. None of them noted or opined that Ms. Grese was delusional, hallucinated, or demonstrated any other signs or symptoms of a thought disorder. She remained on Seroquel. Dr. Cunningham continued to adjust and increase Ms. Grese's Adderall until he ends treatment with her on 05/29/2009.

On 03/15/2009, while still under Dr. Cunningham's direct care, Ms. Grese is admitted to VBPC, this time under the care of Thomas Fernando, M.D. Dr. Fernando documents her severe depression and suicidal risk, but significantly notes, "The patient also thinks that people are against her, and they are trying to hurt her. She also has felt that the CIA was tracking her daily activities, and that her whole house is being taped." He opines that these are clearly "paranoid delusions." Dr. Fernando adjusts Ms. Grese's diagnosis to "Major Depression, Recurrent, with Psychotic Features." As noted earlier, Dr. Cunningham continues to treat Ms. Grese after this hospitalization with no basic change in her treatment plan, begging the question whether he was aware of Dr. Fernando's findings and why he didn't see the obvious and clear deterioration in Ms. Grese's psychological functioning that may have been causally related to his increasing her Adderall prescription. Ms. Grese's care is then taken over at the VA by Kapil Chopra, M.D. on 12/04/2009, and Dr. Chopra notes, "States is dissatisfied due to seeing different psychiatrists at VA." He was at this point in time her 4th VA psychiatrist. She reports she is seeing Dr. Woods in the community. Once again, there is no evidence that any effort was made to contact Dr. Woods much less coordinate Ms. Grese's care.

On 01/08/2010, Ms. Grese is admitted again to VBPC. During this hospitalization Dr. Fernando documents a further deterioration in Ms. Grese's psychological and behavioral functioning when he noted, "She is not able to cope or care for herself." He also documents that she is taking 40-80 mg Adderall per day. Support for Dr. Fernando's clinical impression can be found in Ms. Grese's diary notes that were written just prior to this January 2010 admission. Ms. Grese diaried in a profane, rambling, disorganized and grandiose, paranoid style. She wrote about contacting and waiting to hear from "Oprah," "Whoopi," "Obama." She railed against God and then professes her faith and then railed again. She cursed the Devil. She diaried her struggle with "Adderall." She noted that she is "hooked on pills.' She prophetically referred to Adderall as "lethal." One could see the style and content of these diary notations as the product of a raving maniac.

It is at this juncture that Ms. Grese is crossing the line in terms of meeting the test of being legally insane. Despite all this there is no appreciable change in her treatment plan or her treatment at the VA in terms of increasing the frequency of appointments or change in medication. Consideration is not given as to whether Ms. Grese's gravely decompensated mental state might be "iatrogenic," that she might be suffering with an Amphetamine-Induced Psychotic Disorder with Delusions (DSM-IV-TR 292.12) or both. The DSM-IV-TR criteria seemed to fit Ms. Grese as published, "the appearance of delusions de novo in a person over age thirty-five years without a known history of a Primary Psychotic Disorder should alert the clinician to the possibility of a Substance Induced Psychotic Disorder."

A month later on 02/08/2010, Ms. Grese's 5th VA psychiatrist, William McDaniel, M.D. notes, "Became psychotic secondary to Adderall 60 mg BID." It is at this point that Dr. McDaniel documents that it was the prescription of Adderall by her VA psychiatrists that caused Ms. Grese's psychosis, from which she historically never recovers. In fact, this is the first time that the VA record notes the seriousness of Ms. Grese's psychological decompensation and state of mind. If there had been any communication or coordination of care, this event might have been preventable.

The next note of 03/12/2010, authored by Ms. Greese's 6th VA psychiatrist, Gregory Carr, M.D., documents her continued decline into insanity when he notes, "Patient has been hearing voices that she recognizes as her own thoughts," and "shaved" head. In fact, as attested to by her twin sister, Darla, Ms. Grese shaved her head under the influence and control of a clearly paranoid delusion, believing that the CIA or some other clandestine organization had implanted some sort of device inside her head, and by shaving that side of her head she could gain access to it and remove the electronic device. Dr. Carr clearly establishes that Ms. Grese is now actively psychotic with command hallucinations, clearly increasing the risk of suicidal action. On the same date. Curstine Fitzpatrick-Tabb, R.N., notes "very paranoid," "current suicidal ideas," "has a suicide plan," and further notes more evidence of progressive psychosis and suicidality. There is no basic change in Ms. Grese's prescribed medications. She is still prescribed 900 mg of Seroquel per day. There is no documented evidence that there was consideration to changing anti-psychotic medications or antidepressants or changing dosages.

Martha Guyon, M.D., Ms. Grese's 7th VA psychiatrist, in her note of 03/15/2010 documents that Ms. Grese is now recovering from a Seroquel overdose. This overdose occurring shortly after Dr. Carr had evaluated Ms. Grese as a "moderate risk for suicide." This clinical assessment being contrary to psychiatric nurse Fitzpatrick-Tabb's opinion. Dr. Guyon continues, "More anxious and paranoid, endorses delusions of the CIA following her, which has been chronic; remembers shaving head in response to fears that a device had been implanted there."

Four days later, Ms. Grese is admitted again to VBPC under Dr. Fernando's care on 03/19/2010. Once again she is severely depressed, dysfunctional and a danger to herself, and once again after discharge there is no evidence of communication between Dr. Fernando, VBPC and the VA. There is no basic change in Ms. Grese's treatment plan.

On 03/25/2010, Ms. Grese is transferred from VBPC to the VA psychiatric unit. Her 8th VA psychiatrist, Grant Yoder, M.D., inaccurately reports that Ms. Grese's discharge diagnosis was "Bipolar I Disorder with Psychotic Features," more evidence of a lack of communication or coordination of care. However, despite this error, Dr. Yoder documents another dangerous and ultimately terminal tipping point in Ms. Grese's progressive psychological degeneration and journey toward suicide when he notes, "Stopped taking medications as directed 1 month ago," "Started to have paranoid delusions that she was being watched or followed; reports command type thoughts that made her shave her head; on a later date states her thoughts were telling her to just 'end it.'" The "just end it" development significantly upped the ante in regard to her potential to end her life. Yet there is no appreciable change in Ms. Grese's treatment plan or increased vigilance or change in medication. Could it be that Ms. Grese's complaint of 12/04/2009 about seeing different psychiatrists had merit? Could it be that with so many changes in physician/psychiatrists caused her to get lost in the maze of the VA system? Is this a tragic case of too many cooks spoiling the broth?

William W. McDaniel, M.D., takes responsibility for her care on 04/01/2010 after she is discharged following another Seroquel overdose. He notes that she was still experiencing ideas of persecution and could "hear" her thoughts, felt horribly depressed and experienced racing thoughts. On 06/22/2010 Dr. McDaniel documents just one more in a long series of Seroquel overdoses. This episode required ICU treatment in Pittsburgh, Pa.

Finally on 07/30/2010 La Barbara Williams, R.N., in her documentation concerning Ms. Grese's multiple suicide attempts by means of Seroquel overdose develops an intervention treatment plan in which she opines that, "limit means, develop crisis management plan, decrease anxiety and agitation." Tragically there is no evidence in the VA records that any heed was paid to Ms. Williams' warning or ideas. There was certainly no evidence of any effort to "limit means."

In the end, driven by and worn down by her documented iatrogenic psychosis, and pressured by her progressive and unrelenting paranoid delusions and command hallucinations to "end it," Ms. Grese finally succumbs and ends her life by taking a massive overdose of Seroquel (coroner's report) prescribed by her treating VA psychiatrist(s).

Specifically addressing the of unsound mind issue, based on all the previous material from all available sources, it is clear that Ms. Kelli Grese at the start of her treatment in 1999 suffered with PTSD and depression and, despite her psychological struggles, would not have met the test for the presence of an unsound mind as she was non-delusional and without hallucinations.

Historically the tipping point of Ms. Grese's moving from soundness of mind to that of an unsound state occurs during July 2008 when her VA psychiatrist at that time diagnoses her as suffering with ADD/ADHD and starts her on an aggressive course of stimulant medication. Over time the record shows that she is prescribed up to 120 mg of Adderall per day, if not more for a condition she was never proven to have. Eventually, another VA psychiatrist realizes what is happening to her, and he establishes the diagnosis of an Amphetamine-Induced Psychosis, but by this point in time (02/08/2010) the psychosis has been in existence for almost a year and a half, and has progressed to entrenched paranoid delusions of persecution and command hallucinations that order to "end it" clearly meaning her life. Finally, emotionally broken down and emotionally and physically exhausted, Ms. Grese succumbs to the command and suicides on 11/10/2010.

Therefore, based on the guidelines established by M'Naghten and the model penal code of the American Law Institute, Ms. Kelli Grese, prior to and at the time of her death suffered with a paranoid psychosis and depression with a specific suicide plan, and as a direct result of her paranoid delusions and command hallucinations to "end it" was incapable of understanding the right or wrongfulness of her actions, was incapable of understanding consequences of her actions, and driven by her unrelenting command hallucinations was incapable of adhering her behavior to the right, in effect by the end of her life she had become, by all descriptions by her health care providers, her twin Darla, a friend, and her diary, a raving, self-destructive maniac.

Addressing the standard of care issue, Ms. Kelli Grese's care at the Hampton VA was below the standard of care for multiple reasons. First, accepting that her diagnosis of PTSD and Depression is accurate and correct, she is later misdiagnosed as having ADD based on hearsay by one of her VA psychiatrists. Later, another VA psychiatrist makes the diagnosis without obtaining any history consistent with said diagnosis, there is no evidence of a mental status examination, there is no psychological testing ordered or sought, all below the standard of care. The VA psychiatrist starts out conservatively with an antidepressant and later low doses of stimulants to which it is not unusual to get an initial positive response, especially with a patient who is suffering with depression, which Ms. Grese was. However, the VA psychiatrist and his colleagues eventually continue to increase the dose of Adderall without proper monitoring which is beneath the standard of care, until Ms. Grese has developed a paranoid psychosis that is finally recognized 18 months later.

Ms. Grese's treatment was substandard when there was little to no communication or coordination of care between her civilian psychiatrists and the VA psychiatrists and staff.

Ms. Grese's treatment was below the standard of care when despite the progressive deterioration of her mental state there was no basic changes in her treatment plan in terms of increasing the frequency of visits, closer monitoring, or changing her prescribed medications or dosages thereof.

Ms. Grese's treatment was below the standard of care in that there was no follow up to a suggested treatment change documented by a psychiatric nurse, particularly to her

suggestion to "limit means." In fact, quite to the contrary, Ms. Grese was still prescribed Seroquel in high dosages and high number of units, ultimately providing her with enough Seroquel to end her life."

It is also below the standard of care that if she was indeed psychotic, and she was, there should have been an effort made by Dr. McDaniel to try other antipsychotic medications which is a standard protocol in light of the fact that Seroquel was clearly ineffective. Additionally, Dr. McDaniel should have "limited the means" available to Ms. Grese to kill herself by limiting her access to a lethal dose of Seroquel. It was a breach of the standard of care for Dr. McDaniel to allow Ms. Grese, indeed order that Ms. Grese, have two 30-day supplies of Seroquel in her hand days before her suicide. All of this was beneath the standard of care and led directly to Ms. Grese committing suicide.

It was also a breach of the standard of care for Dr. McDaniel, the last VA psychiatrist to treat Ms. Grese and the last one to have a chance to save her, not to review her records and find those things I have pointed out above.

Ultimately, the treating physicians and nurses at the Hampton VA witnessed Ms. Grese's steady, malignant decent into psychosis, a psychosis that in effect they created. However, even as late as the beginning of 2010, Ms. Grese could have been saved if the treatment she received at that point had been in comporting with the applicable standard of care. Had Dr. McDaniel attempted an alternative intervention or treatment plan, had Dr. McDaniel limited her means to Seroquel and/or switched her to another antipsychotic medication, Ms. Grese could have, and would have, been saved from her suicide. Ultimately, the fact that she committed suicide was directly related to the substandard care she received throughout her course of treatment with the VA Medical Center. Despite a long course of substandard treatment, she would have, and could have, been saved with good treatment beginning in 2010.

Sincerely,

Thomas K. Tsao, M.D., D.L.F.A.PA.
Certified, American Board of Psychiatry and Neurology

# Diagnostic and Statistical Manual of Mental Disorders

## Fourth Edition

# DSM-IV™

American Psychiatric Association

> ☐ **Diagnostic criteria for 293.xx Psychotic Disorder Due to . . . [Indicate the General Medical Condition]** (continued)
>
> Code based on predominant symptom:
> .81 **With Delusions:** if delusions are the predominant symptom
> .82 **With Hallucinations:** if hallucinations are the predominant symptom
>
> **Coding note:** Include the name of the general medical condition on Axis I, e.g., 293.81 Psychotic Disorder Due to Malignant Lung Neoplasm, With Delusions; also code the general medical condition on Axis III (see Appendix G for codes).
>
> **Coding note:** If delusions are part of a preexisting dementia, indicate the delusions by coding the appropriate subtype of the dementia if one is available, e.g., 290.20 Dementia of the Alzheimer's Type, With Late Onset, With Delusions.

## Substance-Induced Psychotic Disorder

### Diagnostic Features

The essential features of Substance-Induced Psychotic Disorder are prominent hallucinations or delusions (Criterion A) that are judged to be due to the direct physiological effects of a substance (i.e., a drug of abuse, a medication, or toxin exposure) (Criterion B). Hallucinations that the individual realizes are substance induced are not included here and instead would be diagnosed as Substance Intoxication or Substance Withdrawal with the accompanying specifier With Perceptual Disturbances. The disturbance must not be better accounted for by a Psychotic Disorder that is not substance induced (Criterion C). The diagnosis is not made if the psychotic symptoms occur only during the course of a delirium (Criterion D). This diagnosis should be made instead of a diagnosis of Substance Intoxication or Substance Withdrawal only when the psychotic symptoms are in excess of those usually associated with the intoxication or withdrawal syndrome and when the symptoms are sufficiently severe to warrant independent clinical attention. For a more detailed discussion of Substance-Related Disorders, see p. 175.

A Substance-Induced Psychotic Disorder is distinguished from a primary Psychotic Disorder by considering the onset, course, and other factors. For drugs of abuse, there must be evidence from the history, physical examination, or laboratory findings of intoxication or withdrawal. Substance-Induced Psychotic Disorders arise only in association with intoxication or withdrawal states, whereas primary Psychotic Disorders may precede the onset of substance use or may occur during times of sustained abstinence. Once initiated, the psychotic symptoms may continue as long as the substance use continues. Because the withdrawal state for some substances can be relatively protracted, the onset of psychotic symptoms can occur up to 4 weeks after the cessation of substance use. Another consideration is the presence of features that are atypical of a primary Psychotic Disorder (e.g., atypical age at onset or course). For example, the appearance of delusions de novo in a person over age 35 years without a known history of a primary Psychotic Disorder should alert the clinician to the possibility of a Substance-Induced Psychotic Disorder. Even a prior history of a primary Psychotic Disorder does not rule

Case 4:12-cv-00049-MSD-TEM Document 25-1 Filed 09/28/12 Page 9 of 13 PageID# 275
Exhibit 1

out the possibility of a Substance-Induced Psychotic Disorder. It has been suggested that 9 out of 10 nonauditory hallucinations are the product of a Substance-Induced Psychotic Disorder or a Psychotic Disorder Due to a General Medical Condition. In contrast, factors that suggest that the psychotic symptoms are better accounted for by a primary Psychotic Disorder include persistence of psychotic symptoms for a substantial period of time (i.e., about a month) after the end of Substance Intoxication or acute Substance Withdrawal; the development of symptoms that are substantially in excess of what would be expected given the type or amount of the substance used or the duration of use; or a history of prior recurrent primary Psychotic Disorders. Other causes of psychotic symptoms must be considered even in a person with Intoxication or Withdrawal, because substance use problems are not uncommon among persons with (presumably) non-substance-induced Psychotic Disorders.

## Subtypes and Specifiers

One of the following subtypes may be used to indicate the predominant symptom presentation. If both delusions and hallucinations are present, code whichever is predominant:

**With Delusions.** This subtype is used if delusions are the predominant symptom.

**With Hallucinations.** This subtype is used if hallucinations are the predominant symptom.

The context of the development of the psychotic symptoms may be indicated by using one of the specifiers listed below:

**With Onset During Intoxication.** This specifier should be used if criteria for intoxication with the substance are met and the symptoms develop during the intoxication syndrome.

**With Onset During Withdrawal.** This specifier should be used if criteria for withdrawal from the substance are met and the symptoms develop during, or shortly after, a withdrawal syndrome.

## Recording Procedures

The name of the Substance-Induced Psychotic Disorder begins with the specific substance (e.g., cocaine, methylphenidate, dexamethasone) that is presumed to be causing the psychotic symptoms. The diagnostic code is selected from the listing of classes of substances provided in the criteria set. For substances that do not fit into any of the classes (e.g., dexamethasone), the code for "Other Substance" should be used. In addition, for medications prescribed at therapeutic doses, the specific medication can be indicated by listing the appropriate E-code on Axis I (see Appendix G). The code for each of the specific Substance-Induced Psychotic Disorders depends on whether the presentation is predominated by delusions or hallucinations: 292.11 for With Delusions and 292.12 for With Hallucinations, except for alcohol, for which the code is 291.5 for With Delusions and 291.3 for With Hallucinations. The name of the disorder (e.g., Cocaine-Induced Psychotic Disorder; Methylphenidate-Induced Psychotic Disorder) is followed by the subtype indicating the predominant symptom presentation and the specifier indicating the context in which the symptoms developed (e.g., 292.11 Cocaine-

# CURRICULUM VITAE
## OF
## THOMAS K. TSAO, M.D., D.L.F.A.P.A.

**PRESENT POSITION:**

Founding Partner, Atlantic Psychiatric Services, P.C.
500 Viking Drive, Suite 200
Virginia Beach, VA 23452

**HOME ADDRESS:**

1003 Coquina Chase
Virginia Beach, VA 23451

**DATE OF BIRTH:** September 1, 1941

**PLACE OF BIRTH:** New York, New York

**SPOUSE:** Joyce Haswell Tsao
Two Children

## EDUCATION:

| | | |
|---|---|---|
| **St. Peters College** Jersey City, New Jersey | Bachelor of Science | 1963 |
| **Hahnemann Medical College** Philadelphia, Pennsylvania | Doctor of Medicine | 1967 |
| **Philadelphia General Hospital** Philadelphia, Pennsylvania | Medical Internship | 1967-1968 |
| **Institute of Pennsylvania Hospital** Philadelphia, Pennsylvania | Residency in Psychiatry | 1968-1971 |

## MILITARY EXPERIENCE:

| | | |
|---|---|---|
| **Naval Regional Medical Center** Portsmouth, Virginia | Staff Psychiatrist | 1971-1972 |
| | Acting Chief of Psychiatry | 1972-1973 |

## PROFESSIONAL EXPERIENCE:

| | | |
|---|---|---|
| **Atlantic Psychiatric Services** Virginia Beach, Virginia | CEO/President | 1981-Present |
| **Portsmouth Psychiatric Center** Portsmouth, Virginia | Psychiatrist | 1972-1982 |
| **Comprehensive Mental Health Program** Virginia Beach, Virginia | Psychiatric Consultant | 1974-1979 |
| **Substance Abuse & Outreach Program** Virginia Beach, Virginia | Psychiatric Consultant | 1979-1981 |
| **McDonald Army Hospital** Fort Eustis, Virginia | Psychiatric Consultant | 1979-1981 |

## APPOINTMENTS:

| | | |
|---|---|---|
| **Portsmouth Psychiatric Center** Portsmouth, Virginia | President of Medical Staff for two years | |
| **Maryview Hospital** Portsmouth, Virginia | Chairman, Department of Psychiatry | |
| **Bayside Hospital** Virginia Beach, Virginia | Chairman, Department of Psychiatry | |
| **PSRO Groups** Colonial Virginia | National Peer Reviewer | 1978-1980 |
| **American Psychiatric Association** | National Peer Reviewer | 1980-1985 |
| **Eastern Virginia Medical School Department of Psychiatry & Behavioral Science** | Assistant Clinical Professor of Psychiatry | 1974-1985 |
| **American Psychiatric Association** | Fellowship | 1988 |
| **American Psychiatric Association** | Distinguished Fellow | 2003 |
| **American Psychiatric Association** | Distinguished Life Fellow | 2006 |

## CERTIFICATION AND MEMBERSHIPS:

| | |
|---|---|
| Certified by the American Board of Psychiatry and Neurology | 1980 |
| Founding President, Tidewater Academy of Psychiatry, Local Chapter of The American Psychiatric Association | 1982-1983 |
| Member of the American Psychiatric Association and the Psychiatric Society of Virginia since the year | 1975-Present |
| Member of the Virginia Beach Medical Society Member of the Portsmouth Academy of Medicine | 1982-Present 1972-1982 |

| | |
|---|---|
| Member Medical Society of Virginia | |
| Member American Medical Association | |
| Member of Credentials Committee of Bayside Hospital | 1984-1986 |
| Chairman of Child and Adolescent Committee Psychiatric Society of Virginia | 1986-1988 |
| Assistant Medical Director, Tidewater Psychiatric Institute | 1986 |
| Medical Director, Tidewater Area for American Psychiatric Management | 1986 |
| Medical Director of Perspectives | 1984-1986 |
| President, Medical Staff, Tidewater Psychiatric Institute | 1986-1987 |
| Medical Director, Tidewater Psychiatric Institutes and Serenity Lodge | 1992-1994 |
| Medical Director, Colonial Hospital and Recovery Center | 1995-1998 |
| Medical Director, Norfolk Psychiatric Center Residential Program | 1998-1999 |
| Special Lecturer in Child and Adolescent Development Eastern Virginia Medical School | 1995-2000 |
| Supervisor, Forensic Psychiatry Rotation Eastern Virginia Medical School | 1998-1999 |
| Supervisor, Psychology Interns, Regent University | 1996-Present |
| Supervisor, Child Psychiatry Residency Program Naval Regional Medical Center, Portsmouth, Virginia | 1999-2000 |
| Presenter, Pediatric Grand Rounds at Georgetown University Medical School | July 25, 2003 |
| FDA Researcher, International Clinical Research Associates Virginia Beach, Virginia | 2002 – 2005 |
| *Tsaoism: Conversational Shrink Speak*, Author | December 2010 |

**Atlantic Psychiatric Services**

500 VIKING DRIVE, SUITE 200 • VIRGINIA BEACH, VA 23452
Phone: (757) 468-0550 • Fax: (757) 468-9992

Rebecca E. Barchas, M.D., L.F.A.P.A.

Rajinder S. Dhillon, M.D.

Leonard M. Dileo, M.D., F.A.P.A

Katharine Heatwole, M.D.

John F. Riedler, M.D.

Mark T. Schreiber, M.D., D.L.F.A.P.A., F.A.S.A.M.

Thomas K. Tsao, M.D., D.L.F.A.P.A.

William A. Yetter, M.D., F.A.P.A.

Jessica Adams, A.P.R.N., B.C.

Tamara L. Atkinson, L.P.C.

Jennifer Baker, M.S.N., N.P.- C.,

Kerry Boone-Savinsky, L.C.S.W.

Melissa S. Clas, L.P.C., N.C.C.

Jennifer Cooke, P.A.

Jessica R. Dexter, N.P.R.N., B.C.

Karen S. Johnson, L.P.C., L.M.F.T.

Joy P. Kannarkat, Ph. D.

Laurel N. Llobell, L.P.C.

Cheryl Lumbard, F.N.P – C.

Susan E. Masterson, L.C.S.W.

Susan P. Menter, L.C.S.W., B.C.D.

Courtney E. Michels, L.P.C., C.S.A.C.

David M. Savinsky, L.P.C., L.M.F.T., C.S.A.C.

Phyllis Saunders, L.C.S.W.

Thomas A. Sugden, Psy.D.

Joyce H. Tsao, L.C.S.W.

Steven F. Waranch, Psy.D. C.S.A.C.

Ken L. Wells, L.P.C.

Diane M. Carrone, M.B.A., C.B.M.
Practice Administrator

July 24, 2012

## THOMAS K. TSAO, M.D., D.L.F.A.P.A.

**FORENSIC WORK PAST FOUR YEARS:**

*Commonwealth of VA v. Nancy Parks Ulrich*, first degree murder, for defendant, August, 2008

*Commonwealth of VA v. David Harrison Dickens*, obstructing justice, assault & batter/police (2 counts), for defendant, September, 2008

*Dickens v. Ellison, MD, et als*, for plaintiff, October, 2010

*Christopher T. Hale v. MAERSK Line Ltd.*, for plaintiff, May 2011

*Commonwealth of VA v. Bradley Scott Colas*, assault & second degree murder, for defendant, June 2012

*Mary Kelly Engelhardt v. Derrick E. White and Hall Automotive, LLC*, for plaintiff, June 2012

**COMPENSATION:**

My expert fee for this case is $300.00 per hour.   My fees to date total $23,400.00.